PETTIGREW, J.
This appeal arises from a judgment of the Office of Workers' Compensation ("OWC") involving a Medical Guidelines dispute. For the reasons set forth herein, we affirm the judgment of the OWC and deny the answer to the appeal.
FACTS AND PROCEDURAL HISTORY
Claimant, Irvin Deubler, injured his lower back in the course and scope of his employment with Bogalusa City Schools ("BCS") on October 22, 2012, and thereafter began receiving benefits pursuant to the Louisiana Workers' Compensation Act. Mr. Deubler suffered chronic low back pain following the accident, and at some point was referred to Dr. Artemus Flagg *395 at the Advanced Pain Institute for treatment.[1]
On July 10, 2017, Mr. Deubler saw Dr. Flagg for a follow-up examination and to discuss treatment options for his chronic low back pain. Dr. Flagg's records list Mr. Deubler's diagnoses as chronic pain syndrome, lumbar radiculopathy, lumbago, neuralgia, and neuritis. At this visit, Mr. Deubler rated his pain as a 7. Mr. Deubler reported that his pain was relieved by pain medication. Dr. Flagg noted that Mr. Deubler had undergone epidural steroid injections in the past, but Mr. Deubler stated that his most recent injection did not provide him with as much relief as previous injections. Dr. Flagg provided Mr. Deubler with information about a spinal cord stimulator ("SCS"), they discussed the risks and benefits of undergoing an SCS trial, and he gave Mr. Deubler an instructional DVD to review. He also refilled Mr. Deubler's narcotic pain medication.
On August 7, 2017, Mr. Deubler returned to Dr. Flagg for a follow-up visit for his chronic low back pain. On this date, he described his pain level as 9/10. Mr. Deubler noted that pain medication is helpful, and that epidural steroid injections had been helpful in the past, but that he is awaiting adrenal gland testing before he is able to have another injection. Dr. Flagg refilled Mr. Deubler's narcotic pain medication and instructed him to return in a month.
On September 7, 2017, Mr. Deubler returned for a follow-up appointment with Dr. Flagg to discuss treatment options for his chronic low back pain. Mr. Deubler reported that his pain had increased in severity over the past several weeks, and on the date of his visit, it was a 10 or 10+. The pain occurred persistently. He reported that the relief he obtains from epidural steroid injections has diminished over the years, but he does get relief from narcotic pain medication. Mr. Deubler expressed interest in proceeding with an SCS trial, and Dr. Flagg noted his belief that if Mr. Deubler obtained greater than 60 percent relief from the SCS trial, he would benefit from an SCS implant, because it would allow him to take less opioid-based pain medication, increase his functional activity level, and live with less discomfort and pain. To that end, Dr. Flagg planned to order an MRI of Mr. Deubler's thoracic and lumbar spine to review the associated pathology with his symptoms and to rule out any thecal sac compression or narrowing, as well as a psychological evaluation as required for an SCS.
On September 28, 2017, BCS's workers compensation insurer, LUBA Casualty Insurance Company ("LUBA"), received requests from Dr. Flagg on LWC Form 1010 for an MRI of Mr. Deubler's thoracic and lumbar spine without contrast and for a psychological evaluation of Mr. Deubler for an SCS trial. Dr. Flagg listed Mr. Deubler's diagnoses on both requests as chronic pain syndrome, lumbago, lumbar spondylosis, and lumbar radiculopathy. In support of the requests, Dr. Flagg attached Mr. Deubler's medical records from his July 10, August 7, and September 7 office visits.
LUBA denied both requests, apparently due to a desire to have Mr. Deubler evaluated by a physician pursuant to La. R.S. 23:1121 prior to approving the requested treatment;[2] and Dr. Flagg sought review *396 of the denial by the OWC medical director by filing a Disputed Claim for Medical Treatment on LWC Form 1009. A Medical Guidelines Dispute Decision was issued on October 16, 2017, by Associate Medical Director Dr. Jason Picard, denying the request for the thoracic MRI because "[t]he patient has no thoracic radicular pain as per the guidelines," but approving the requests for the lumbar MRI and psychological evaluation for the SCS trial, noting that "[t]he patient has lumbar pain and failure of conservative therapy as per the guidelines."
LUBA and BCS filed a Disputed Claim for Compensation on LWC Form 1008, along with an attached appeal of the associate medical director's decision, requesting that the OWC overturn the decision on the grounds that the approval of the lumbar MRI and the psychological evaluation was not in accordance with the Medical Treatment Guidelines. At the January 5, 2018 hearing before OWC Judge Robert Varnado, counsel for LUBA and BCS argued that the lumbar MRI was not in accordance with the guidelines because Mr. Deubler had undergone a prior MRI, making this second MRI a redundant procedure, and "the records that were submitted ... in support of the [request for authorization for the MRI] do not satisfy the Medical Treatment Guidelines requirements and do not adequately establish a need for a follow-up MRI." Additionally, in reference to the psychological evaluation, counsel for LUBA and BCS argued that the purpose of the evaluation was to qualify Mr. Deubler for an SCS trial, which had not yet been requested, and for which they argued Mr. Deubler would not be eligible under the guidelines regardless of the results of the psychological evaluation. LUBA and BCS offered no additional evidence at the hearing, and the OWC judge rendered judgment in favor of Mr. Deubler, upholding the associate medical director's decision.
LUBA and BCS appealed suspensively, arguing that the OWC judgment upholding the associate medical director's decision was manifestly erroneous because the associate medical director's decision was contrary to the Medical Treatment Guidelines. Mr. Deubler filed an answer to the appeal, requesting attorney fees for work done on the appeal.
DISCUSSION
In 2009, the legislature enacted La. R.S. 23:1203.1, which charged the OWC Director with establishing a medical treatment schedule. See La. R.S. 23:1203.1(B). The Medical Treatment Guidelines became effective July 13, 2011, and are promulgated in the Louisiana Administrative Code, Title 40, Part I, Subpart 2, Medical Guidelines. The statute is the product of a combined endeavor by employers, insurers, labor, and medical providers to establish meaningful guidelines for the treatment of injured workers, and expresses the legislature's intent that, with the establishment and enforcement of the Medical Treatment Guidelines, all medical treatment shall be delivered in an efficient and timely manner to injured employees. La. R.S. 23:1203.1(L) ; Church Mutual Insurance Company v. Dardar, 13-2351, p. 5 (La. 5/7/14), 145 So.3d 271, 275-76.
Louisiana Revised Statutes 23:1203.1(I) provides that following the promulgation of the medical treatment schedule, the medical care, services, and treatment due, pursuant to La. R.S. 23:1203 et seq., by the employer to the employee shall mean the care, services, and treatment in accordance with the medical treatment schedule. However, when the medical care, services, and *397 treatment that are recommended vary from the promulgated medical treatment schedule, those too shall be due by the employer when it is demonstrated to the OWC medical director by a preponderance of the scientific medical evidence that a variance from the medical treatment schedule is reasonably required to cure or relieve the injured worker from the effects of his injuries given the circumstances. La. R.S. 23:1203.1(I). When a dispute arises as to whether the recommended medical care, services, or treatment is in accordance with the medical treatment schedule, or whether a variance is reasonably required under La. R.S. 23:1203.1(I), any aggrieved party may file an appeal with the OWC medical director or associate medical director. La. R.S. 23:1203.1(J).
Once the OWC medical director or associate medical director renders a decision concerning treatment, care, or services requested, any party who disagrees with the decision may then appeal that finding by filing a Disputed Claim for Compensation on LWC Form 1008. La. R.S. 23:1203.1(K). The decision of the medical director or associate medical director may be overturned on review when it is shown, by clear and convincing evidence, that the decision of the medical director or associate medical director was not in accordance with the provisions of La. R.S. 23:1203.1. La. R.S. 23:1203.1(K). Additional evidence may be necessary for the party appealing the medical director or associate medical director's decision to meet the higher burden of proof statutorily required to overturn that decision; therefore, additional competent evidence is admissible at the hearing notwithstanding that it was not presented to the medical director or associate medical director. Thompson v. DHH-Office of Pub. Health, 15-1032, p. 9 (La. App. 1 Cir. 2/26/16), 191 So.3d 593, 598, writ denied , 16-00716 (La. 6/3/16), 192 So.3d 751.
By their terms, La. R.S. 23:1203.1 and the medical treatment schedule do not exclude any particular care. Instead, those provisions represent and reflect a rational policy choice by the legislature to confer authority on the OWC Director, with the assistance of the medical advisory council and the medical director, to determine in advance the medical necessity for certain medical care. In regards to medical procedures not included in the medical treatment schedule and, thus, not presumptively deemed necessary, claimants can overcome the predetermination by seeking review and/or a variance from the medical director. La. R.S. 23:1203.1(I) and (J) ; Church, 13-2351 at pp. 19-20, 145 So.3d at 284. In this way, La. R.S. 23:1203.1 and the medical treatment schedule create a rebuttable presumption as to the necessary treatment required by La. R.S. 23:1203(A). Id. at p. 20, 145 So.3d at 285.
On appeal from an OWC judgment reviewing the medical director's decision under La. R.S. 23:1203.1(K), the manifest error standard of review applies. Thompson, 15-1032 at p. 6, 191 So.3d at 596. In order to reverse, the appellate court must find that the record reflects that there is no reasonable basis for the OWC judge's factual determinations. Bourgeois v. Brown's Deli & Market, Inc., 09-290, p. 4 (La. App. 3 Cir. 10/14/09), 21 So.3d 1072, 1075.
When seeking review of LUBA's denial from the associate medical director, Mr. Deubler had the initial burden of proving, by a preponderance of the evidence, either that the requested services were in accordance with the medical treatment schedule, or that a variance from the medical treatment schedule was reasonably required to cure or relieve him from the effects of his injuries under the circumstances.
*398 La. R.S. 23:1203.1(J). However, once the associate medical director determined that the lumbar MRI and psychological evaluation were medically necessary and appropriate (either because they were in accordance with the medical treatment schedule or because a variance was reasonably required under the circumstances), then, in order to have this decision overturned, LUBA had the burden of proving to the OWC, by clear and convincing evidence, that the associate medical director's decision was not in accordance with the provisions of La. R.S. 23:1203.1. La. R.S. 23:1203.1(K).
The medical records from Dr. Flagg's office state that Mr. Deubler was being treated for chronic pain, which is defined in the Medical Treatment Guidelines as "pain that persists for at least 30 days beyond the usual course of an acute disease or a reasonable time for an injury to heal or that is associated with a chronic pathological process that causes continuous pain." LAC 40:I.2105(F). According to the Chronic Pain Disorder Guidelines, delayed recovery should prompt, among other things, consideration of new diagnostic testing or a change in treatment plan. LAC 40:I.2105(F). Furthermore, the guidelines provide that operative intervention for chronic pain management (such as an SCS implant) should be based on a positive correlation with clinical findings, the clinical course, and diagnostic tests, and a comprehensive assessment of these factors should have led to a specific diagnosis with positive identification of the pathologic condition. LAC 40:I.2113(A).
The medical records submitted by Dr. Flagg with his request for authorization for a lumbar MRI noted that Mr. Deubler's chronic lower back pain was worsening despite use of pain medication and therapeutic injections. Dr. Flagg requested the lumbar MRI to "review the associated pathology with his symptoms and to rule out any thecal sac compression or narrowing" prior to proceeding with an SCS trial. The only argument LUBA and BCS made at the OWC hearing in support of their position that the lumbar MRI was not medically necessary or appropriate was that the MRI was a redundant procedure under LAC 40:I.2019 since Mr. Deubler had undergone a prior MRI. This provision of the Spine Medical Treatment Guidelines states, in pertinent part:
Magnetic resonance imaging (MRI), myelography, or computed axial tomography (CT) scanning following myelography, and other imaging procedures and testing may provide useful information for many spinal disorders. When a diagnostic procedure, in conjunction with clinical information, can provide sufficient information to establish an accurate diagnosis, the second diagnostic procedure will become a redundant procedure. At the same time, a subsequent diagnostic procedure can be a complementary diagnostic procedure if the first or preceding procedures, in conjunction with clinical information, cannot provide an accurate diagnosis.
LAC 40:I.2019(C)
There is absolutely no evidence in the record of the prior MRI referred to by LUBA and BCS, let alone any evidence that the prior MRI, in conjunction with clinical information, provided sufficient information to establish an accurate diagnosis so as to render a follow-up MRI redundant and unnecessary under the guidelines. Additionally, Dr. Flagg's request for a lumbar MRI to review the associated pathology with Mr. Deubler's symptoms and rule out any thecal sac compression or narrowing is in accordance with the Chronic Pain Disorder Medical Treatment Guidelines, which state that operative intervention for chronic pain, *399 such as an SCS implant, should be based on "a positive correlation with clinical findings, the clinical course, and diagnostic tests." LAC 40:I.2113(A). Based on the evidence presented, we cannot say that the OWC judge erred in finding that LUBA and BCS failed to prove, by clear and convincing evidence, that the associate medical director's decision approving the lumbar MRI was not in accordance with the provisions of La. R.S. 23:1203.1.
LUBA and BCS also argued at the OWC hearing that the requested psychological evaluation was not in accordance with the guidelines because the medical records provided did not establish that Mr. Deubler was qualified for an SCS implant. Although LUBA and BCS's argument was based on the guidelines for an SCS implant, the request was not for authorization of an SCS implant; it was for a pre-surgical psychological evaluation required to qualify him as a candidate for an SCS implant under the guidelines. See LAC 40:I.2113(A)(2)(c) (iii).
The guidelines applicable to SCS implants are found in LAC 40:I.2113(A)(2) and provide, in pertinent part:
2. Neurostimulation
a. Description -- Neurostimulation is the delivery of low-voltage electrical stimulation to the spinal cord or peripheral nerves to inhibit or block the sensation of pain. This is a generally accepted procedure that has limited use. May be most effective in patients with chronic, intractable limb pain who have not achieved relief with oral medications, rehabilitation therapy, or therapeutic nerve blocks, and in whom the pain has persisted for longer than six months....
....
c. Surgical Indications -- Failure of conservative therapy including active and/or passive therapy, medication management, or therapeutic injections.... Only patients who meet the following criteria should be considered candidates for neurostimulation :
i. A diagnosis of a specific physical condition known to be chronically painful has been made on the basis of objective findings; and
ii. All reasonable surgical and non-surgical treatment has been exhausted; and
iii. Pre-surgical psychiatric or psychological evaluation has been performed and has demonstrated motivation and long-term commitment without issues of secondary gain; and
iv. There is no evidence of addictive behavior. (Tolerance and dependence to narcotic analgesics are not addictive behaviors and do not preclude implantation.); and
v. The topography of pain and its underlying pathophysiology are amenable to stimulation coverage (the entire painful area has been covered); and
vi. A successful neurostimulation screening test of two-three days. A screening test is considered successful if the patient (a) experiences a 50 percent decrease in pain, which may be confirmed by visual analogue scale (VAS), and (b) demonstrates objective functional gains or decreased utilization of pain medications. Functional gains may be evaluated by an occupational therapist and/or physical therapist prior to and before discontinuation of the trial.
vii. For spinal cord stimulation, a temporary lead is implanted at the level of pain and attached to an external source to validate therapy effectiveness.
*400 (For peripheral nerve screening, a nerve block is performed to define the specific nerve branch but if multiple branches are involved, a screening test for spinal cord stimulation may be indicated.) Long-term functional improvement is anticipated when objective functional improvement has been observed during time of neurostimulation screen exam.
d. Contraindications -- Unsuccessful neurostimulation test - either inability to obtain functional improvement or reduction of pain, those with cardiac pacemakers, patient unable to properly operate the system. It should not be used if future MRI is planned.
LUBA and BCS argued at the hearing before the OWC that Mr. Deubler would not qualify for an SCS under the guidelines because the guidelines limit the application of the SCS to extreme cases of pain, and the evidence did not support a finding that Mr. Deubler was in intractable pain and unable to achieve relief with oral medications. The guidelines do not, as LUBA and BCS suggest, strictly limit the procedure to patients who cannot obtain relief from oral medication. Rather, the guidelines state that neurostimulation"[m]ay be most effective in patients with chronic, intractable limb pain who have not achieved relief with oral medications, rehabilitation therapy, or therapeutic nerve blocks...." LAC 40:I.2113(A)(2)(a). The medical records in evidence show that Mr. Deubler saw Dr. Flagg for chronic pain, which was persistent and worsening. At his September 7, 2017 visit, Mr. Deubler rated his pain as 10/10 or 10+. Although Mr. Deubler acknowledged that narcotic pain medication was helpful in relieving his pain, he nevertheless reported being in significant pain at his office visits. Based on the evidence presented, the OWC judge found that LUBA and BCS failed to prove by clear and convincing evidence that the associate medical director's decision approving the psychological evaluation should be overturned.
On appeal, LUBA and BCS raise two additional requirements for an SCS implant, which they allege were unproven by the medical records and therefore precluded approval of the psychological evaluation: a diagnosis of a specific physical condition known to be chronically painful based on objective findings, and exhaustion of all reasonable surgical treatment. As noted above, the request at issue is not for an SCS implant, but rather for a pre-surgical psychological evaluation to determine whether Mr. Deubler would be a candidate for the SCS implant, contingent on the results of the subsequent SCS trial. It is certainly understandable that pre-surgical testing would not be appropriate for a claimant who could not possibly qualify for the surgical procedure. However, in this case, the supporting medical evidence established that Mr. Deubler's treating physician for his chronic low back pain had reviewed the risks and benefits of the procedure and believed that if Mr. Deubler were able to undergo an SCS trial and obtain greater than 60 percent relief from the trial, then Mr. Deubler could benefit in a number of ways from the implantation of an SCS, including taking less opioid-based pain medication, increasing his functional activity level, and living with less discomfort and pain. The associate medical director was authorized by La. R.S. 23:1203.1 to approve the requested evaluation, although it may vary from the guidelines, if it is proven by a preponderance of the evidence that the evaluation is reasonably required to cure or relieve Mr. Deubler from the effects of his injury under the circumstances. Based on the evidence presented, we cannot say that the OWC judge erred in concluding that LUBA and *401 BCS failed to prove by clear and convincing evidence that the associate medical director's decision was contrary to the provisions of La. R.S. 23:1203.1.
Finally, although Mr. Deubler filed an answer to the appeal requesting attorney fees for work performed in handling the appeal, he did not brief this issue, either in his answer to the appeal or in his untimely-filed appellate brief. Mr. Deubler's answer to the appeal contains only the following assignment of error, with no argument whatsoever: "Attorney's fees should be awarded to claimant and his counsel for work performed in handling this appeal." His appellate brief likewise does not address the assignment of error, but merely includes in the prayer for relief a request for "all other relief in the premises, including attorney fees for work done on appeal, as requested in his Answer to Appeal." This issue has been abandoned because Mr. Deubler did not brief his assignment with argument or citation of authority to support his assertion. Restating an assigned error in brief without argument or citation of authority does not constitute briefing. Under U.R.C.A. 2-12.4(B)(4), this court may consider as abandoned any assignment of error that has not been briefed. State v. Wilson, 13-996, pp. 8-9 (La. App. 5 Cir. 5/21/14), 142 So.3d 275, 279-80. Because Mr. Deubler has failed to brief this assigned error, we consider it abandoned.
CONCLUSION
For the reasons set forth herein, the January 11, 2018 judgment denying the appeal of the Medical Guidelines Dispute decision is affirmed. Mr. Deubler's answer to the appeal, containing only one abandoned assignment of error, is denied. All costs of the appeal are assessed to the appellants, LUBA Casualty Insurance Company and Bogalusa City Schools.
AFFIRMED; ANSWER TO APPEAL DENIED.

The record on appeal contains only medical records from three office visits in 2017; however, these medical records indicate that Mr. Deubler was treating with Dr. Flagg at least as far back as 2014.

Although LUBA's denial is not contained in the record on appeal, LUBA's appeal of the associate medical director's decision states that it denied the requests so that it could have Mr. Deubler evaluated pursuant to La. R.S. 23:1121. There is no evidence in the record that such an evaluation took place.